**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>             )<br>        Plaintiff, )<br>             )<br>v.           )<br>             )<br>NORMAN MARTIN, )<br>             )<br>        Defendant. )<br>_____ ) | 2:08-cr-0060-GMN-LRL<br><br>MOTION TO SUPPRESS (#19) |

## REPORT & RECOMMENDATION

The defendant, Norman Martin, is under indictment on one count of Felon in Possession of a Firearm and one count of Felon in Possession of Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924 (a)(2). The firearms and ammunition were seized during the execution of a search warrant. Martin has filed a Motion to Suppress (#19), in which he contends that the affidavit in support of the search warrant was facially deficient in that it did not provide probable cause to search Martin's residence. Accordingly, he argues that the seized firearms and ammunition, as well as statements he made when the warrant was executed, should be suppressed as fruits of an unlawful search. The court has considered the motion, the government's Opposition (#20), and defendant's Reply (#23).

### BACKGROUND[1]

On May 1, 2006, Detective Andrade of the Las Vegas Metropolitan Police Department ("Metro") was contacted by a concerned citizen, who told Det. Andrade that Martin was involved in various illegal activities, including selling prescription medicine and methamphetamine, forging checks

---

[1] The following facts are taken from Det. Andrade's affidavit in support of the warrant, attached as Exh. A to the motion.

and DMV documents, as well as possessing stolen property and/or guns. Asked how he came to know these things, the citizen stated that an associate of his had firsthand information and had witnessed illegal activities. Det. Andrade agreed to meet with the citizen and to arrange a meeting with the associate.

On May 3, 2006, Det. Andrade met with the citizen and was introduced to his associate, the confidential informant ("CI").[2] The CI stated that a black adult male by the name of Norman Martin resided at 1313 Pyramid Drive in Las Vegas, with his wife Angela Martin. The CI indicated that Martin's adult daughter and son, Alicia and Anthony, also resided at that address. The CI said that he had known Martin for a couple of years and had lived or slept in Martin's home for the past few years.

The CI reported that Martin was involved in numerous illegal activities including drug sales, possession of firearms, and falsifying prescriptions, identifications, and DMV plates and tags. The CI specifically alleged that Martin possessed several weapons, including a .38 caliber revolver and a Tech-9 submachine pistol, which he allegedly kept in a back room at the rear of the residence. The back room was reportedly an enclosed patio. He also stated that Martin kept one of the guns inside a safe located on a shelf against a wall in the back room. He claimed that it was not uncommon for Martin to step out the backdoor of the enclosed patio and discharge the Tech-9 pistol in the air. The CI further said Martin kept the Tech-9 in a hidden compartment in the back room at the base of the bar with a padlock on it. The CI stated that he had seen Martin carrying a gun on his person in the house during drug transactions and that Martin liked guns. The CI acknowledged last seeing the firearms in the residence approximately two weeks before the interview with Det. Andrade.

The CI also alleged that Martin sold methamphetamine and prescription medicine from the 1313 Pyramid Drive address, and that Martin kept half-ounce quantities of methamphetamine in the house. He said he had personally seen narcotics being sold and offered for sale at the residence. The CI stated

---

[2] A recording of Det. Andrade's interview with the CI was provided with Andrade's affidavit in support of his warrant application and is attached as Exhibit A-1 to the instant motion.

2

that numerous people come and go from the house and purchase methamphetamine and prescription drugs on a regular basis, and that there is heavy foot and vehicle traffic as people approach the residence. The CI further admitted to purchasing and receiving methamphetamine from Martin on a daily basis over the past few years. He said that Martin has numerous individuals coming over and hanging out in the back room getting high.

When asked about his motive for providing the information, the CI said he was tired of seeing Martin take advantage of other people and do them wrong by stealing from them. When asked if he expected anything in return for cooperating, the CI said no. The CI had six outstanding warrants. While Det. Andrade did not make any promises to the CI, he told him that his cooperation would be conveyed to the District Attorney's office and might help to get the warrants on calendar for ultimate resolution.

In the days following the interview, Det. Andrade set out to corroborate the CI's information. A records check on the property confirmed that a Norman and Angela Martin owned the 1313 Pyramid Drive residence, and an Accurint records checks showed that a Norman Martin and an Anthony Martin resided at that address. A Scope records check confirmed 1313 Pyramid Drive as the residential address for Norman, Angela, and Anthony Martin. Criminal background checks revealed Norman Martin to be a four time registered convicted felon for Possession of a Controlled Substance With Intent to Sell, Threatening a Murder, Assault/Battery, and four counts Unlawful Distribution of Cocaine.

Det. Andrade set up surveillance on the home from May 2 through May 5, 2006. He did not witness criminal activity but saw multiple vehicles parked in the garage, driveway and curbside, all appearing to have a thirty day temporary DMV registration tag and no license plate. On two occasions he witnessed Martin exit the residence and walk to the front yard; one of those times Martin opened the door of a pickup truck in the front yard, looked inside, closed the truck door and went back in the house.

On May 5, 2006, Det. Andrade conducted a second interview with the CI. The CI told him that there is a large storage shed in the rear of the residence, but most of the activity occurs in the back room. The CI also said that the residence had at least five surveillance cameras all wired to televisions in the

back room. He then described the location of the cameras at the residence. He said that one was on the rooftop on top of the air conditioning unit facing east; one was on the window sill inside the window of the northeast bedroom facing east toward the road; and other cameras were mounted on the fascia boards near the garage, including one facing east directly above the garage.

On May 8, 2006, Det. Andrade contacted LA Clear to see if any existing investigations were being conducted on the address. He learned that on April 7, 2006, an LVMPD Det. Nelson was listed as a contact for a drug investigation into the 1313 Pyramid Drive address. Det. Andrade contacted Det. Nelson, who advised that on April 7, 2006, he had interviewed a suspect identified as Darren Phillips[3] who had been arrested in a car stop by a patrol officer for being a felon in possession of two handguns. Det. Nelson said that Phillips had told him about a black male named Norman Martin who resided at 1313 Pyramid. He stated that Martin lived with his wife, Angela, and son Tony and also had other people living with him: Homer, Alicia, and a white male named Tim who lived in a storage shed in the back yard. Phillips stated that Martin was involved in fraudulent checks and fake IDs, and also that Martin was selling methamphetamine out of the residence and usually has approximately one ounce in the house at any given time. Phillips further said that Martin had a back room located at the rear of the house, and in that room are televisions wired to surveillance cameras mounted outside the front of the residence. He told Det. Nelson that Martin had protection from Donna Street Crips and GPK gang members to sell methamphetamine from the house, and the gang members would come over at night to hang out in the back room with Martin. Phillips also said that Martin kept numerous firearms in the back room, and he had seen a Tech-9 pistol, an UZI, an AR-15 or SKS type rifle and four or five pistols located in the back room. Phillips further stated that Martin carried a Glock 40 or 380 handgun on his person around the house.

Det. Nelson advised that he intended to use Phillips as a CI to conduct a controlled drug buy from the residence, but Phillips never contacted Det. Nelson once released from detention. Det. Nelson

---

[3] Phillips is a four time registered convicted felon out of Nevada for Evading a Police Officer, Robbery, Attempt CCW, and Attempt Larceny from Person.

told Det. Andrade that a couple weeks later, Phillips was stopped by a patrol officer, Off. Ploense, in a vehicle stop in front of Martin's residence, from which Off. Ploense recovered some methamphetamine. No further contact with Phillips had been made since Off. Ploense's vehicle stop. Neither Det. Nelson nor Andrade made any promises to assist Phillips with criminal proceedings in exchange for the information he provided.

Det. Andrade contacted Off. Ploense, who reported that on April 19, 2006, he made contact with Phillips in two separate incidents. First, Off. Ploense and his partner stopped Phillips driving an unregistered car in front of the 1313 Pyramid address. They wrote several citations and advised him to leave the car parked by the curb and not to drive it. About three hours later, the officers saw the same car driving up to the 1313 Pyramid address and they conducted a second vehicle stop. The car was occupied by three people, Elizabeth Dawkins (driver), Darren Phillips and Keith Martin. During the stop, officers recovered 4.1 grams of methamphetamine and arrested Dawkins for Trafficking Methamphetamine. Keith Martin was also arrested on outstanding warrants, and he reportedly pointed to the 1313 Pyramid house indicating that it was his brother's house. Off. Ploense said that two people exited the house and approached to see what was going on.

On May 9, 2006, Det. Andrade conducted additional surveillance of 1313 Pyramid. He saw two surveillance cameras exactly where the CI indicated they would be – one on top of the air conditioning unit and one mounted on the fascia board in the front of the house directly above the garage. Based on the previous purchases of narcotics by the CI, the similar information by the CI and Phillips, and the vehicle stop by Off. Ploense resulting in the recovery of methamphetamine in front of the suspect residence, Det. Andrade concluded that ongoing criminal activity of the sale of methamphetamine and possession of firearms by prohibited persons was occurring at 1313 Pyramid Drive and thus applied for a search warrant of the residence on May 10, 2006.

State District Judge Michelle Leavitt signed the warrant, and it was executed on May 11, 2006.[4]

---

[4] The following facts are as stated in the Continuation Report, attached as Exh. B to the motion.

5

Seven people were detained at the residence when the warrant was executed, including Norman Martin, Anthony Martin, Anthony Mack, Christina Ramirez, Lance Chavez, Rhonda Williams and a seventeen year-old, Heather Duarte. Prior to searching the residence, Det. Andrade conducted preliminary interviews with three of the detained subjects: Martin; Martin's son, Anthony Martin; and Martin's friend, Chavez. Det. Andrade neither informed Martin that he was the primary suspect of the investigation nor did he show Martin a copy of the affidavit, which was sealed to protect the CI. Det. Andrade asked Martin if there was anything he should know about for safety reasons, and Martin stated there was some methamphetamine, marijuana, and two firearms he allegedly admitted were his. Martin showed detectives where his firearms were located in the back room. A Remington 788 bolt-action .243 caliber rifle with scope was located on the lower shelf behind the bar in the back room; a Squires Bingham .22 caliber semi-automatic rifle was also located next to the rifle. A box of various ammunition was found on the floor of the room.

Martin then gave detectives keys to his padlocks on the refrigerator and a hidden compartment door at the bottom of the bar, as well as the combination to a safe located in the back room behind a computer desk. From the hidden compartment, detectives seized additional ammunition and a detached handgun magazine containing .38 caliber super ammunition. Detectives seized various papers and a floppy disc from a lockbox and located a gun cleaning kit on top of the bar in the back room. Detectives additionally recovered a plastic bag containing 2.8 grams of methamphetamine from a denim skirt and a baggie of marijuana. After determining that the rifles, ammunition, and methamphetamine belonged to Martin, he was arrested and charged.

**DISCUSSION**

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." "Nowhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved." *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 884 (9th Cir. 1990). A search warrant must be supported by an affidavit establishing probable cause. Probable cause

exists when "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). A judge's determination of probable cause will be overturned only if it is clearly erroneous. *Stanert*, 762 F.2d 775, 778 (9th Cir. 1985). In making the determination, the court is "limited to the information and circumstances contained within the four corners of the underlying affidavit." *Id.* "The duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . concluding that probable cause existed." *Gates,* 462 U.S. at 238 (internal quotations omitted).

The affidavit supporting the warrant application at issue here contained information from (1) the CI; (2) statements of Det. Nelson regarding information he gained from Phillips; (3) Det. Andrade's own observations of the residence; and (4) information provided to Det. Andrade by Off. Ploense. Martin attacks Det. Andrade's affidavit in support of the warrant as insufficient to give rise to probable cause. *See* Mot. (#19) at 6. Martin alleges that the information relied upon was provided "almost entirely" by a confidential informant lacking a proven track record of reliability, and that the CI's information was stale insofar as he had not been in Martin's home for two weeks prior to the warrant. It is further asserted that Det. Andrade did not himself fully believe the CI's information, and the level and quality of corroboration of the CI's information is insufficient to support the CI's credibility. Accordingly, it is argued, the search of Martin's residence violated his Fourth Amendment rights and all evidence seized must be suppressed. *Id.* Additionally, Martin maintains that his statements to Det. Andrade must be suppressed as the "fruits" of an illegal search and seizure. *Id.*

To determine whether an informant's tip is sufficient to support a finding of probable cause, a court must use a "totality-of-the-circumstances approach" that takes into consideration the informant's "veracity" or "reliability" and his "basis of knowledge." *Gates*, 462 U.S. at 238. "[C]ertain classes of informants are considered more reliable than others," with criminal informants falling in the least reliable class. *United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986). Accordingly, criminal informants require more evidence to establish their veracity. *Id.* The Ninth Circuit has

identified several factors to which a court should look in determining the reliability of an informant's tip. *See United States v. Rowland*, 464 F.3d 899, 907-08 (9th Cir. 2006). These factors include (1) whether the informant is known or anonymous; (2) whether the informant has a proven track record of reliability; (3) the informant's basis of knowledge; and (4) whether the informant "provides detailed predictive information about future events that is corroborated by police observation." *Id.*

Several indicia of reliability were present to support the CI's tip. First, the CI was not anonymous, but personally known to Det. Andrade. *See Rowland*, 464 F.3d at 907 ("A known informant's tip is thought to be more reliable than an anonymous informant's tip.) (citing *Florida v. J.L.*, 529 U.S. 266, 271 (2000); *Adams v. Williams*, 407 U.S. 143, 146-47 (1972)). Moreover, Det. Andrade knew where to find the CI, which Andrade did when he conducted a second interview; hence Det. Andrade presumably could have held the CI accountable if his information proved to be false. *Rowland*, 464 F.3d at 908 (citing *United States v. Terry-Crespo*, 356 F.3d 1170, 1176 (9th Cir. 2004) (explaining that exposure to legal sanction for providing false information increases reliability of a tip)).

Second, the CI clearly had a substantial basis for his knowledge: he personally witnessed Martin's activities while he was living in Martin's house for several years. *See Rowland*, 464 F.3d at 908 (an informant's tip is considered more reliable if he is able to reveal his basis for knowledge of the information) (citing *Spinelli v. United States*, 393 U.S. 410, 416 (1969) *abrogated on other grounds by Gates*, 462 U.S. at 238)). The CI reported that he had personally obtained methamphetamine from Martin on nearly a daily basis, had seen him sell methamphetamine and offer it for sale at the residence, and had seen Martin keep and carry weapons within the residence. He further identified the occupants of the residence and gave detailed descriptions of the interior of the house based on his own observations.

Although the CI was not of proven reliability, the credibility of his information was "enhanced" to the extent that his detailed account of events was corroborated by the statements another informant. *See United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2003) (citing *United States v. Hernandez-Escarsega*, 886 F.2d 1560, 1566 (9th Cir. 1989). Most of the information the CI provided

about Martin, his house, and his activities, including his criminal activities, was corroborated by sources unconnected to him.  The interview of Phillips on April 7, 2006 independently tracked the CI's allegation that Martin sold and kept a significant amount of methamphetamine at the residence; that there was a back room in which Martin met with groups of individuals at night; that Martin carried a gun in the residence; that Martin kept a Tech-9 pistol and other firearms in the residence; that Martin had surveillance cameras which fed to a television in the back room; and that Martin was engaged in making fake IDs and fraudulent checks.

Moreover, Det. Andrade personally observed surveillance cameras on the home in the precise locations provided by the CI and many vehicles with temporary DMV tags parked at the house.  Det. Andrade also ran records checks indicating that Norman Martin and his wife and son did, in fact, reside at the residence as indicated by the CI and Phillips.  Finally, Off. Ploense stopped a car containing Phillips in front of the 1313 Pyramid Drive address, and upon locating four grams of methamphetamine, arrested the driver for Trafficking Methamphetamine.  While the corroborating information obtained from any one of the above sources on its own may not be enough to establish the reliability of the CI's information, when taken together, and in light of the interlocking nature of the CI's information with Phillip's statements, Det. Andrade's corroboration of various details, and Off. Ploense's statements regarding the vehicle stops, it clearly enhances the reliability of the CI's information regarding the activities at the 1313 Pyramid Drive address.  *See Alvarez*, 358 F.3d at 1204 ("The overlapping nature of the informants' tips rendered them credible under circuit precedent."); *Hernandez-Esquarsega*, 886 F.2d at 166 ("Although the reliability of several of [the] confidential sources was not clearly established, the detailed nature of many of their statements and the interlocking nature of their stories enhanced their credibility.")[5]

---

[5] Martin alleges that Det. Andrade's recorded interview with the CI indicates that Det. Andrade did not himself find the CI's statements to be credible. Mot. (#19) at 8.  The court disagrees.  The court has listened to the interview, which reveals that the last time the CI and Martin interacted, they engaged in a physical altercation – two weeks prior to the interview.  In addition, the concerned citizen who introduced Det. Andrade to the CI is also heard stating their belief that Martin had stolen property from their home.  Accordingly, as Martin notes, Det. Andrade inquired more than once about the CI's motivation in providing information and whether the CI was really on good enough terms to engage in a controlled buy from Martin without raising Martin's suspicions.  In these circumstances, it is only reasonable and

That two weeks had passed between the last time the CI was in the Pyramid Drive residence and the time he talked to Det. Andrade about Martin's criminal activity does not render the CI's information stale for probable cause purposes. To find probable cause, an issuing judge need not determine that the evidence sought is *in fact* on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. *United States v. Fernandez*, 388 F.3d 1199, 1254 (9th Cir. Cal. 2004) (citing *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir. 1985) (emphasis in original, citations omitted), *overruled on other grounds by Gomez v. United States*, 490 U.S. 858 (1989)). The issuing judge need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit. *Id.*

Here both the CI and Phillips indicated that Martin was engaged in multiple, ongoing criminal enterprises, including drug trafficking. "[I]n the case of drug dealers, evidence is likely to be found where the dealers live." *Angulo-Lopez*, *supra*, 791 F.2d at 1399. In cases involving narcotics trafficking, lapses of several months, or even up to two years in some circumstances, are not sufficient to render the information in an affidavit too stale to support probable cause. *Fernandez*, 388 F.3d at 1254; *see United States v. Pitts*, 6 F.3d 1366, 1369-70 (9th Cir. 1993) (holding that four-month lapse between crack sale involving defendant in different location and affidavit was not enough to render information stale where affidavit supported inference that defendant was "more than a one-time drug seller"); *Angulo-Lopez*, 791 F.2d at 1399 ("With respect to drug trafficking, probable cause may continue for several weeks, if not months, of the last reported instance of suspect activity."); *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) ("The mere lapse of substantial amounts of time is not controlling in a question of staleness."). Based on the totality of the circumstances, and in light of the *Rowland* factors, the court finds that the issuing judge had a "substantial basis" for her finding of probable cause to search 1313 Pyramid Drive for evidence of ongoing criminal activity. *Gates,* 462

---

expected that a detective would test the statements of the CI before spending time attempting to corroborate them. In any event, a spiteful motive is not enough to render an informant's information unreliable. *See United States v. Bishop*, 264 F.3d 919, 925-26 (9th Cir. 2001) ("it would have to be a very naive magistrate who would suppose that a confidential informant would drop in off the street with such detailed evidence and not have an ulterior motive").

U.S. at 238. Having found that the warrant was supported by probable cause, the court need not reach the government's "good faith execution" argument under *United States v. Leon*, 468 U.S. 897 (1984).

Lastly, Martin requests an evidentiary hearing. Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court." *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) (citation omitted). "A hearing will not be held on a defendant's pre-trial motion to suppress merely because a defendant wants one. Rather, the defendant must demonstrate that a 'significant, disputed factual issue' exists such that a hearing is required." *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990) (citation omitted). Here, an evidentiary hearing is not warranted because Martin challenges only the affidavit's showing of probable cause. In making the probable cause determination the reviewing court is limited to the information and circumstances contained within the four corners of the affidavit. *See Stanert*, 762 F.2d at 778. In his Reply (#23), however, Martin asks the court to look beyond the facial sufficiency of the affidavit; he challenges the truthfulness of the factual statements made in the affidavit. Yet he doesn't expressly request a *Franks* hearing. Nor could he, because the record is without a foundation for such a request.

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Martin's Motion to Suppress (#19) should be denied without an evidentiary hearing.

DATED this 5th day of October, 2010.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**